IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

GREAT LAKES REINSURANCE (UK)    )
PLC,    )
    )
        Plaintiff,    )
    )        Civil No. 2011-122
vs.    )
    )
GLENN KRANIG and NATIONAL    )
EXCHANGE BANK AND TRUST,    )
    )
        Defendants.    )
_____ )

## MEMORANDUM OPINION

Before the Court is Great Lakes Reinsurance (UK) PLC's ("Great Lakes") Motion for Summary Judgment [DE 57] pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure of the District Court of the Virgin Islands. Defendants oppose the motion.  [DE 63].

## I.    FACTUAL BACKGROUND[1]

This litigation arises out of the total loss of the 2002 catamaran sailboat "Solitude" (the "Vessel"), owned by Glenn Kranig ("Kranig"), and the subsequent denial of Kranig's insurance claim by his insurer, Great Lakes.

Great Lakes issued a policy of marine insurance to Kranig in 2010 (the "2010 Policy") and a second policy in 2011 (the "2011 Policy"). Great Lakes issued both policies through authority granted to Osprey Special Risks Limited ("Osprey"), Great Lakes' underwriting agent. Theodore Tunick & Co., St. Thomas, USVI ("Tunick"), a retail surplus line broker, acted as the

---

[1]    In accordance with the standard of review for a motion for summary judgment, the Court sets forth the facts in the light most favorable to Kranig.  *See infra* Part II.  The Court cites Great Lakes' statement of facts when discussing undisputed facts.  Otherwise, the Court relies on filings and exhibits cited by Kranig.

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 2

agent on behalf of Kranig.  Pl.'s Statement of Facts ("SOF") ¶¶ 4, 6-8 [DE 59]; Decl. Beric

Anthony Usher ("Usher Decl.") ¶ 8 [DE 59-1].[2]  National Exchange Bank and Trust ("NEBAT")

has a lien on the Vessel.[3]  Pl.'s SOF ¶ 5; Ex. C [DE 59-3].

## A.      Kranig's Application for Coverage & Issuance of the 2010 Policy

On April 4, 2010, Kranig submitted an Osprey Yacht Application (the "Application") to

Tunick.  Pl.'s SOF ¶ 8; Ex. E [DE 59-5].  In the four-page Application, Kranig disclosed himself

and Christina Bonwit ("Bonwit") as the sole operators of the Vessel and stated that neither he nor

Bonwit had (1) been involved in a loss in the last 10 years (insured or not), (2) been convicted of

or pled no contest to a criminal offense, and/or (3) received auto violations or suspensions in the

last five years.  Pl.'s SOF ¶ 9; Ex. E [DE 59-5].  The Application contained the following

---

[2]      At all times relevant, Usher was employed as Managing Director and Senior Underwriter for Osprey, which "functions as the exclusive yacht underwriting agency offering yacht and charter boat insurance policies on behalf of Great Lakes."  Usher Decl. ¶¶ 1-2 [DE 59-1].  Usher's duties include "making the final determination as to whether, and on what terms, marine insurance coverage will be agreed to with respect to any particular risk that is submitted by a broker to Osprey."  *Id.* ¶ 3.

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  "The Third Circuit has interpreted the rule to require an affiant to state facts, rather than opinions and conclusions."  *Bell v. Lackawanna County*, 892 F. Supp. 2d 647, 661 (M.D. Pa. 2012) (*citing Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985)).

The Usher declaration meets the personal knowledge requirement as it is based on Usher's review of Kranig's application materials as well as his personal knowledge of Osprey's underwriting policies.  *See Washington Cent. R.R. Co. v. National Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) (explaining personal knowledge can be based on a review of business files and records).  The competency requirement is also met because as Managing Director and Senior Underwriter for Osprey, Usher's competency may be reasonably inferred from his high level position.  *See DirecTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (explaining a court may rely upon affidavits in the summary judgment context where the affiants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore") (*quoting Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).  Finally, the declaration is based on Kranig's insurance application documents which "'would be admissible in evidence' [under the] business records" exception to the hearsay rule.  *LPP Mortg., Ltd. v. Carpenter*, 2012 U.S. Dist. LEXIS 180799, at *8 (D.V.I. Dec. 21, 2012) (*quoting* FED. R. CIV. P. 56 (c)); FED. R. EVID. 803(6).

[3]      The 2011 Policy, which renewed the 2010 Policy, named NEBAT as a loss payee.  Pl.'s SOF ¶¶ 7-8; Ex. D [DE 59-4].

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 3

statement: "**WARNING: THIS IS A NAMED OPERATOR POLICY ONLY.  ANY**

**PERSON OPERATING THIS VESSEL WITHOUT PROVIDING FULL DETAILS &**

**RECEIVING WRITTEN ACCEPTANCE BY UNDERWRITERS WILL NOT BE**

**COVERED.**"  Pl.'s SOF ¶ 10; Ex. E [DE 59-5] (emphasis in original).  The Application included

the following terms immediately preceding Kranig's signature:

1. This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained therein.

2. Any misrepresentation in this application for insurance will render insurance coverage null and void from inception. Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.

Pl.'s SOF ¶ 9; Ex. E [DE 59-5].

Following submission of the Application, Great Lakes issued the 2010 Policy, which

provided coverage for the period May 20, 2010 to April 1, 2011.  Pl.'s SOF ¶ 8.

**B.      The Renewal Questionnaire**

On April 5, 2011, after the 2010 Policy expired, Kranig completed a Virgin Islands

Charter Yacht League ("VICL") "Renewal Questionnaire Effective: April 1, 2011" (the

"Renewal Questionnaire").  Pl.'s SOF ¶ 11; Ex. F [DE 59-6].  The one-page Renewal

Questionnaire stated that "[a]ny misrepresentation in this application for renewal of insurance

will render insurance coverage null and void from inception." Pl.'s SOF ¶ 11; Ex. F [DE 59-6].

The Renewal Questionnaire sought information regarding "any changes in coverage limits," the

intended location of the Vessel at various times of the year, whether there had been changes to

navigation or safety equipment, and "details of any other changes."  Ex. F [DE 59-6].  The

Renewal Questionnaire also provided that any items "left blank [on the questionnaire] will result

in coverage remaining 'as is.'"  Ex. F [DE 59-6].

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 4

Thereafter, Great Lakes issued the 2011 Policy, dated May 31, 2011, which provided

coverage for the period May 1, 2011 to April 1, 2012.  Pl.'s SOF ¶¶ 6, 11; Ex. D [DE 59-4].

**C.      The 2011 Policy & the Survey of the Vessel**

The 2011 Policy provided, *inter alia*, the following:

- 'Covered person,' means you, and/or any person detailed on your application form which has been submitted by you and approved by us, provided that person has been declared to us in writing as an operator of the Scheduled Vessel.

- This is a legally binding insurance contract between you and us, incorporating in full the application form signed by you. We will provide the insurance coverage described in the insuring agreement, in return for payment to us of the premium due and compliance by covered persons with the provisions, conditions and warranties of this insuring agreement.

- This insuring agreement incorporates in full your application for insurance and together with any endorsements issued herein, constitutes the entire contract between us. At your request, various provisions of this insuring agreement may be varied by us but only by our prior written agreement.

- This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision.

- Unless we agree in writing to the contrary, if we request a survey of the Scheduled Vessel then it is warranted that survey is in existence prior to the effective date of this insurance . . . Failure to comply with this warranty will void this agreement from inception.

- Where any term herein is referred to as a "warranty" or where any reference is made herein to the word "warranted," the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void the policy from inception.

Ex. D, Commercial Yacht Insuring Agreement ("CYIA") §§ 1-2, 9(b), 9(l), 9(q), 9(s).

The 2011 Policy also provided that "Additional Warranties, Terms and Conditions" includes "Survey as per VICL survey warranty."  Ex. D at 3 [DE 59-4].  The VICL survey warranty appears in the Amendatory Clauses Effective April 1, 2011 VICL Master Policy Schedule OSPYP/130700 ("Amendatory Clauses"), which provided as follows:

> Survey Warranty.
> Our definition of a <u>current</u> out of water survey is as follows:
> 1)   All vessels under 5 years of age – no survey required.
> 2)   All vessels over 5 years of age – survey required.
> 3)   1st survey should be out of water.
> 4)   An out of water survey is valid for 3 years.
> 5)   An in water survey is valid for 2 years (valid three years if supplied with a divers inspection).
> 6)   Vessels over ten years of age or of non-fiberglass construction MUST supply a divers inspection if *supplying* an *in* water survey.
> 7)   Vessels must have an out of water survey within the last 5 years.
> 8)   Vessels over 25 years of age must submit an out of water survey not more than 2 years old prior to quotation.
> 9)   Vessels of Wood Construction Out-Of-Water survey Valid for 2 Years.
>
> \*    Unless specifically agreed in writing all vessels requiring a survey must be surveyed by July 1, 2011 or within 90 days of attachment.  Survey recommendations to be complied with within a further 30 days.  Underwriters agree to accept owners/assureds signed statement of recommendations compliance subject to the attachment of repair receipts or surveyors compliance report.

Ex. D, CYIA Amendatory Clauses [DE 59-4] (emphasis in original).

On September 26, 2007, an out-of-water survey was conducted on the Vessel.  Ex. 7 [DE 65-4]; *see also* Ex. G, Kranig Dep. at 86:17-20 [DE 59-7].  On March 30, 2011, an in-water survey was conducted on the Vessel.  Ex. 6 [DE 65-3].  In either May or June 2011, Kranig received a notice from Tunick entitled "**<u>WARRANTY SCHEDULE – FINAL[;] ONLY ITEMS MARKED BY 'X' ARE REQUIRED</u>**," which provided in relevant part as follows:

> In order to satisfy the new Survey Warranty, please submit the following documentation as required

> **X**    **Diver's Bottom Inspection** Condition/Valuation Survey(s) **Due By: July 1, 2011**
> …
> **X**    Owner's Statement of Compliance, as/if required by the Diver's Bottom Inspection **Due By[:] July 1, 2011**
> …
>
> **NOTE: FAILURE TO COMPLY WITH THIS SURVEY WARRANTY WILL VOID COVERAGE FROM INCEPTION &/OR LACK OF COMMUNICATION MAY BE CAUSE FOR CANCELLATION WITHOUT FURTHER NOTICE**

Ex. G at 38 [DE 59-7] (emphasis in original).

**D.    The Vessel's Final Voyage**

On August 6, 2011, Bonwit released the Vessel's mooring in Elephant Bay, Water Island in order to move the Vessel to another mooring.  In the process, Bonwit grounded the Vessel, which eventually sank.  Pl.'s SOF ¶¶ 14-15.

**E.    Investigation of the Sinking Vessel**

As part of Kranig's insurance claim proceedings, Great Lakes retained Nautilus Investigations ("Nautilus") to investigate the circumstances surrounding the sinking of the Vessel.  Pl.'s SOF ¶ 16.  As part of its investigation, Nautilus examined both Kranig and Bonwit under oath.[4]  Ex. J [DE 59-10]; Ex. M [DE 59-13].  The investigation revealed, *inter alia*, the following:

(1)    In 2009, Kranig was charged in the Superior Court of the Virgin Islands in an Amended Complaint in Criminal No. 120/09 with grabbing Bonwit and pulling her "down the stairs" (count one); aggravated assault and battery for strangling her (count two); pushing her off a boat (count three); and simple assault and battery for strangling her (count four). Pl.'s SOF ¶ 22; Ex. N [DE 59-14].  Kranig pled guilty to "simple assault and battery – domestic violence" in violation of 14 V.I.C. § 299(2) and 16 V.I.C. § 91(b)(1)(2), and a judgment was entered on his guilty plea on June 5, 2009.[5]  Ex. O [DE 59-15]; Ex. G,

---

[4]    *See* Ex. D, CYIA § 10(9) [DE 59-4] (providing that underwriters may require an examination under oath).

[5]    Great Lakes contends that during Nautilus' examination of Kranig, Kranig falsely responded "no" to the

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 7

Kranig Dep. 22:15-25, 24:4-19 [DE 59-7].

(2)    In 2006, Bonwit had an automobile accident while driving under the influence of alcohol and drugs and pled guilty to a DUI.[6]  Pl.'s SOF ¶ 17; Ex. J at 53:4-16, 56:3-4 [DE 59-10].

(3)    In 2008, Bonwit's license was suspended.  Ex. L, State of Florida Driver License Check [DE 59-12].[7]

At the time Kranig signed the Application, he (1) considered domestic violence to be a non-criminal offense and (2) believed his responses regarding Bonwit's driving and criminal background (based on representations by Bonwit) were correct.  Pl.'s SOF ¶ 24; Kranig's Dep., Ex. 1 at 21-22, 29-30 [DE 69-1].

**F.    2011 Policy Insurance Premium Payments & Tender of the Premium**

Master-Risk, Inc. ("Master-Risk"), a premium finance company, made the 2011 Policy premium payment to Great Lakes on behalf of Kranig pursuant to an Insurance Premium Finance

---

question "Have you or any named operator been convicted of a criminal offense or pleaded no contest to a criminal action?"  Pl.'s SOF ¶ 20; Ex. M at 59:21-25 [DE 59-13].  It is evident from the context in which the question was presented that the examiner for Nautilus Investigations was simply confirming Kranig's responses provided in the Application.

[6]      Kranig challenges Great Lakes' assertion that Bonwit had "pled guilty to driving under the influence of alcohol and drugs," noting that during Bonwit's sworn examination, she stated only that she had pled guilty to a DUI.  Defs.' Resp. Pl.'s SOF ¶ 17 [DE 64].  Kranig also claims that Bonwit's DUI conviction is disputed given "the Florida Criminal Background Check does not indicate a criminal conviction." *Id.* (citing [DE 59-11]).

Even viewing this evidence in the light most favorable to Kranig, the Court finds Kranig's attempt to create a genuine dispute of material fact unconvincing.  During her sworn examination, Bonwit stated, without equivocation, that she pled guilty to a DUI in 2006.  Ex. J at 53:15-16 [DE 59-10]; *id.* at 56:3-4.  Moreover, when asked whether she was "driving under the influence of alcohol and drugs," Bonwit responded in the affirmative, attributing her DUI to an adverse reaction between alcohol ("one or two drinks") and her depression medication.  Ex. J at 53:4-6, 10-14.  Bonwit made no attempt to refute the plain meaning of her testimony.  The Court concludes no reasonable jury could find that Bonwit's criminal history does not include a DUI given Bonwit's own sworn admission to the contrary.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

[7]      Kranig argues that Bonwit's sworn examination, and in particular her comment that her child support is "all set up wrong [] [and] needs to be reset," suggests that Bonwit's license had not been suspended.  A fair reading of Bonwit's statements does not support Kranig's position.

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 8

Agreement ("Finance Agreement").[8]  Ex. Q [DE 59-17].  Pursuant to the Finance Agreement, Kranig appointed Master-Risk as his attorney-in-fact, granting it power to cancel the 2011 Policy and receive any return premium.[9]  *Id.*  The Finance Agreement provided further that to the extent a surplus existed, Master-Risk agreed to return the surplus to Kranig.  *Id.*

In a November 7, 2011 letter addressed to Kranig, Great Lakes denied Kranig's insurance claim and declared the 2011 Policy void from its inception, citing Kranig's "misrepresentations regarding Bonwit's loss and criminal history" and his "breach [of the] warranty concerning a survey of the Vessel."  Ex. P [DE 59-16]; *see also* Pl.'s SOF ¶ 30.  Great Lakes also requested from Kranig payee information so that Great Lakes could tender the full return premium for the 2011 Policy.  Ex. P [DE 59-16]; *see* Ex. D, CYIA §, 9(d) (stating if the insuring agreement is cancelled by Great Lakes, it "will pay [the insured] a pro rata return of premium").

In a November 9, 2011 letter, Master-Risk, referencing the Finance Agreement, advised Osprey and Tunick that Kranig had granted Master-Risk a power of attorney to cancel the Policy and assigned to Master-Risk any monies payable to Kranig.  Pl.'s SOF ¶ 31; Ex. Q [DE 59-17].  Great Lakes subsequently tendered the return premium to Master-Risk.  Pl.'s SOF ¶ 31; Exs. R &

---

[8]      "Premium financing is a common practice in the insurance industry involving an advance by the finance company to the insurance company or its agent of the premium due for the full term of the policy."  *In re U.S. Repeating Arms Co.*, 67 B.R. 990, 995 (Bankr. D. Conn. 1986).  "This advance is then repaid by the insured to the finance company in amortized monthly installments which includes an additional amount to cover financing charges."  *Id.*

[9]      The authority granted  by the Finance Agreement provides:

> As long as I owe money to Master-Risk, Inc., I grant Master-Risk. Inc. my power of attorney to cancel any or all policies financed by this transaction security:  I hereby assign any monies which become payable to me from the insurance company(ies) because of changes to or cancellation of my policy(ies).  Those monies will be applied to reduce my balance and if there is more returned than is owed, the excess balance will be returned to me.  I agree not to assign the policy, except for the interest of mortgagees and loss payees, without prior written consent.

Ex. Q [DE 59-17].

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 9

S [DE 59-18; 59-19].  Thereafter, Master-Risk issued a check for the balance of the premium due to Kranig; however, Kranig never cashed the check.  Ex. T [DE 59-20].  In September 2012, Master-Risk voided the check because it was "stale-dated."  Ex. T [DE 59-20].

## II.   JURISDICTION & STANDARD OF REVIEW

District courts of the United States "have original jurisdiction . . . of [a]ny civil case of . . . maritime jurisdiction."  28 U.S.C. § 1333(1); *see Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955) ("Since the insurance policy here sued on is a maritime contract[,] the Admiralty Clause of the Constitution brings it within federal jurisdiction.").  Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 48 U.S.C. § 1612(a), which provides the District Court of the Virgin Islands with the same "jurisdiction of a District Court of the United States."

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining "irrelevant or unnecessary" factual disputes do not preclude summary judgment).  A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "In considering a motion for summary judgment, a [] court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *N.H. Ins. Co. v. Diller*, 678 F. Supp. 2d 288, 295 (D.N.J. 2009) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004)).

The movant has the initial burden of showing no genuine issue of material fact exists. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). Once the moving party meets this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323; *see Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (stating the non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements"); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument").

### III.   APPLICABLE LAW

### A.   Federal Admiralty Law – The Doctrine of *Uberrimae Fidei*

"Marine insurance [policies] are governed by federal admiralty law when there is an established federal rule, and by state law when there is not." *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 305 (2d Cir. 1987). The choice of law provision in the 2011 Policy incorporates this rule as follows:

> It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.

Ex. D, CYIA § 11 [DE 59-4]. The relevant entrenched admiralty law applicable in part to this matter is the doctrine of *uberrimae fidei*.[10]   *See AGF Marine Aviation & Transport v. Richard C.*

---

[10]     The 2011 Policy indicates the parties' intent to have *uberrimae fidei* apply to the insurance contract. *See* CYIA § 9(l) (providing "contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance"); *see also Great Lakes Reinsurance (UK) PLC v. Yellow Fin 36 LLC*, 736 F. Supp. 2d 1302, 1307 (M.D. Fla. 2010) (observing identical policy provision indicated parties' intent for *uberrimae fidei* to apply to the insurance contract).

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 11

*Cassin Cit Group/Sales Fin., Inc. ("Cassin II")*, 544 F.3d 255, 263 (3d Cir. 2008) (holding that the doctrine of *uberrimae fidei's* status as federal admiralty law is "well entrenched" within the Third Circuit's precedent).

    *Uberrimae fidei* is a longstanding federal maritime doctrine that applies to marine insurance contracts. *Id.* at 262 (citations omitted); *see St. Paul Fire & Marine Ins. Co. v. Halifax Trawlers, Inc.*, 495 F. Supp. 2d 232, 238 (D. Mass. 2007) (noting the United States Supreme Court first recognized the doctrine of *uberrimae fidei* in *M'Lanahan v. Universal Ins. Co.*, 26 U.S. 170 (1828)). Meaning "utmost good faith," the doctrine requires applicants for marine insurance to "fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk," even when this information is not explicitly sought or asked for by the insurer. *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000); *accord Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 283 (1st Cir. 2006) ("[U]nder the strict maritime rule of *uberrimae fidei*, an insured must make full disclosure of all material facts of which the insured has, or ought to have, knowledge . . . even though no inquiry be made."). "A party's intent to conceal, or lack thereof, is irrelevant to the *uberrimae fidei* analysis" – the insured's failure to disclose voids the contract and its coverage. *Cassin II*, 544 F.3d at 263.

    In *M'Lanahan*, the Supreme Court stated that the "test of materiality" in the *uberrimae fidei* context is "whether the risk be increased so as to enhance the premium."[11] That is, a fact is

---

[11]    *M'Lanahan*, 26 U.S. at 188; *accord In re Ocean Dev. 1, LLC*, 2012 Bankr. LEXIS 2550, at *19-20 (Bankr. S.D. Fla. June 5, 2012). Interestingly, the Third Circuit, in discussing the appropriate standard for determining materiality in the *uberrimae fidei* context, did not rely on *M'Lanahan* in defining "materiality." Rather, the Third Circuit limited its materiality discussion to commenting on, but not adopting, standards applied by the Second and Ninth Circuits. In particular, the Third Circuit

    (1)    rejected the Second Circuit's construction of materiality – i.e., "'something which would have controlled the underwriter's decision to accept the risk'" – as "too narrow;"

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 12

"material" for purposes of the *uberrimae fidei* doctrine if it would have either prevented an insurer from issuing a policy or prompted an insurer to issue the policy at a higher premium had it been disclosed before the policy was executed. *See e.g., Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1163 (D. Alaska 2005) (stating "to be material the fact must impact the underwriter's decision to either (1) accept the risk or (2) [] set[] the premium"); *Christiania General Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir. 1992) ("A fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer [] would either not have issued the policy or would have only at a higher premium."); *Fraser*, 211 F.3d at 1363 (stating a fact is material if "it might have a bearing on the risk to be assumed by the insurer"); *accord* L. Buglass, Marine Insurance & General Average in the United States 24 (2d ed. 1981)).

An objective standard for disclosure applies – that is, whether a reasonable insured would believe that a particular fact is material to the insurer's decision regarding whether to accept the

(2) described the Ninth Circuit's construction of materiality – i.e., "'[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law'" – as broad and holding it was unnecessary to accept this interpretation to resolve the dispute before it; and

(3) noted but apparently did not apply the definitions found in

    a.  Black's Law Dictionary – i.e., defining "material" as "of such a nature that knowledge of the item would affect a person's decision-making; significant; essential; and

    b.  Marine Insurance & General Average in the United States – i.e., stating a material fact is one that "would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

*Cassin II*, 544 F.3d at 264-65 (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986); *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001); Black's Law Dictionary 998 (8th ed. 2004); L. Buglass, Marine Insurance and General Average in the United States 24 (2d ed. 1981)).

Given the lack of Third Circuit precedent, the Court applies the test espoused by the Supreme Court in *M'Lanahan*, which is nearly identical in substance to the definition appearing in Marine Insurance & General Average in the United States and to the standard applied in the Eleventh Circuit in *HIH Marine*, the law which guided in part the Third Circuit's decision in *Cassin II*.

risk and on what terms. *Cassin II*, 544 F.3d at 264 (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986)). The burden of proof of a material nondisclosure or misrepresentation lies with the insurer. *Cassin I*, 48 V.I. 720, 725 (D.V.I. 2007) (citing *Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1340 (9th Cir. 1986)). Although materiality is generally a question of fact, summary judgment may be appropriate in certain cases. *See Knight*, 804 F.2d at 14 (materiality of undisclosed information is ordinarily a jury issue); *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 283 (1st Cir. 2006) ("Courts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances."); *but see AIG Centennial Ins. Co. v. O'Neill*, 2010 U.S. Dist. LEXIS 114148, at *19 (S.D. Fla. Oct. 18, 2010) ("Materiality of misrepresentation is a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question") (citation omitted).

## B.    New York Law

"There is no specific federal rule governing the construction of marine insurance contracts." *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999). Thus, pursuant to the choice of law provision in the 2011 Policy, New York law determines "the scope and validity of the marine insurance policy provisions involved and the consequences of breaching them."[12] *Advani Enters. v. Underwriters at Lloyds*, 140 F.3d 157, 163 (2d Cir. 1998) (alterations & internal quotations omitted); *see Cassin II*, 544 F.3d at 262 (invoking the identical choice of law provision as that applicable to the instant matter); *see also Great Lakes Reinsurance (UK) PLC v. Durham Auctions Inc.*, 585 F.3d 236, 242 (5th Cir. 2009)

---

[12]    With the exception of a single reference to the choice of law provision by Great Lakes, the parties' briefs are silent as to the controlling state law. *See* Pl.'s Mem. at 11 n.4.

("A choice of law provision in a marine insurance contract will be upheld in the absence of evidence that its enforcement would be unreasonable or unjust."); *Chan v. Society Expeditions*, 123 F.3d 1287, 1296 (9th Cir. 1997) ("[W]here the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice.).

New York courts interpret insurance contracts "to give effect to the intent of the parties as expressed in the clear language of the contract." *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999) (citation and internal quotation marks omitted). "The initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). "Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998); *accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Whether [] a writing is ambiguous is a question of law to be resolved by the courts."); 2 Couch on Insurance 3d § 21:13 (same). If the court finds the provisions of an insurance policy clear and unambiguous, "it should assign the plain and ordinary meaning to each term." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). "If an insurance policy is ambiguous, all ambiguity must be resolved in favor of the policy holder . . . ." *Mitlof*, 208 F. Supp. 2d at 412.

"An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Group, Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000). Generally, the terms of

insurance policies are read "in light of common speech and the reasonable expectations of a businessperson." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (citations omitted); *accord Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 241 A.D.2d 66, 671 N.Y.S.2d 66, 68-69 (N.Y. App. Div. 1998) (stating that courts are to construe the terms of an insurance contract as they are used in common speech).

## IV.  SUMMARY JUDGMENT AGAINST KRANIG

Great Lakes moves for summary judgment, asserting that no coverage is available to Kranig as a matter of law for three reasons.  First, Great Lakes argues that pursuant to the admiralty doctrine of *uberrimae fidei*, the 2011 Policy is void *ab initio* as a result of Kranig's failure to disclose material information regarding his and Bonwit's criminal and driving backgrounds.  Second, Great Lakes contends Kranig breached the survey warranty.[13]  Third, Great Lakes argues that coverage under the 2011 Policy is precluded as a result of Kranig's acceptance of the full policy premium refund through Master-Risk.

The Application specifically inquired whether any operators (here, Kranig and Bonwit) had "violations/suspensions (including Auto) in [the] last 5 years," "been involved in a loss in the last 10 years (insured or not)" or "been convicted of a criminal offense or pleaded no contest."  It is undisputed that in the Application, Kranig answered those questions in the negative.  It is also undisputed that Kranig pled guilty to a criminal offense, that Bonwit pled guilty to a criminal offense, and that Bonwit's driver's license had been suspended during the relevant time period.

---

[13]    Under the law governing maritime insurance contracts, warranties hold a special status.  In particular, both federal admiralty and New York law require the strict construction of express warranties in maritime insurance contracts regardless of any causal connection to the loss.  *Commercial Union Ins. Co. v. Flagship Marine Servs.*, 190 F.3d 26, 31 (2d Cir. 1999); *accord Hartford Fire Ins. Co. v. Mitlof*, 208 F. Supp. 2d 407, 412 (S.D.N.Y. 2002) ("Under New York law, recovery under a marine insurance contract is precluded if a warranty is breached, regardless of its materiality to the insurer's risk.").

Therefore, the Court finds there is no genuine issue of material fact that Kranig failed to disclose his and Bonwit's criminal and driving histories on the Application.[14]   A review of the Renewal Questionnaire [DE 59-6] reveals that Kranig also did not disclose these criminal and driving histories on that document.

The Court must next determine whether the nondisclosures were material.  In support of its materiality argument, Great Lakes submitted the declaration of Beric Anthony Usher, Osprey's Managing Director and Senior Underwriter, who stated that Great Lakes would not have issued the 2011 Policy had he or "the other Osprey director at that time" known of Bonwit's or Kranig's "true driving and criminal histories."  Usher Decl. ¶ 20 [DE 59-1]; Pl.'s Mem. at 8. Therefore, Great Lakes contends the 2011 Policy must be declared void as a matter of law for failure to disclose these facts.

Defendants argue the nondisclosures were not material (and thus would not have affected a decision to insure) based on the following: (1) Great Lakes' alleged failure to consider the "complete background" of each operator; (2) the alleged conversion of the 2011 Policy from a "named operator only" policy to an "any operator with adequate experience" policy which effectively "waived any requirement for approval of vessel operators;" and (3) the lack of an explicit reference in the Renewal Questionnaire to the Application.  Defs.' Resp. Pl.'s SOF ¶¶ 10-11, 26 [DE 64]; Defs.' Resp. at 3, 9 [DE 63].

Addressing defendants' first argument, the Application required that Kranig provide details on a "separate sheet" regarding any affirmative responses to the "General Information"

---

[14]      Great Lakes argues, and defendants dispute, whether Bonwit had also been involved in a "loss," as that term is not defined by Great Lakes in the Application.  Defs.' Resp. Pl.'s SOF ¶ 25 [DE 64].  The Court need not entertain an analysis of whether Kranig's response of "no" on the Application to the question regarding Bonwit's loss history was an omission given the record conclusively establishes omissions in the form of Kranig's and Bonwit's criminal background and Bonwit's suspended driver's license.

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 17

section found on page 3 of the Application.  While Kranig responded affirmatively to some of the questions within that section, he did not include a "separate sheet."  Thus, according to defendants, Great Lakes' acceptance of an incomplete application suggests "a fact finder could conclude that Great Lakes was aware that Kranig had not completely answered the inquiries on the application and elected to ignore the absence of the 'complete background.'"  Defs.' Resp. Pl.'s SOF ¶ 10 [DE 64] (quoting Pl.'s SOF ¶ 10).

Even assuming Kranig submitted an incomplete application, it is undisputed that the "operators" section of the Application requested criminal, driving and loss history.  Thus, Great Lakes' alleged acceptance of an incomplete application did not relieve Kranig of his obligation to disclose the criminal and driving histories of the Vessel's operators when faced with direct questions on the application form.  No reasonable trier of fact could conclude otherwise.

Next, defendants contend that the Amendatory Clauses to the 2011 Policy included a "significant and material change" from prior policies because it broadened the definition of "covered person" (i.e., the named operators in the insured's application) to include any person with "adequate experience" operating the vessel.  Defs.' Resp. at 9 [DE 63]; Ex. D, CYIA § 1 & Amendatory Clauses [DE 59-4].  Thus, according to defendants, a fact finder could conclude that after April 1, 2011, "Great Lakes allowed any experienced person to operate the vessel, regardless of prior loss history or criminal/driving background."  Defs.' Resp. at 9.  This argument is untenable given that the identical Amendatory Clauses were in effect at the time Kranig submitted the Application.[15]  *See* Pl.'s Resp. Defs.' Counterstmt, Ex. 3 [DE 70-3].

---

[15]        Great Lakes produced a copy of the "Amendatory Clauses effective April 1, 2010" with its reply and not during discovery.  While defendants did not object to Great Lakes' new evidence, reply briefs are generally not the time to present new evidence.  *See United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) ("A reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues.").  Here, however, Great Lakes produced this new evidence in direct

Finally, defendants contend the Renewal Questionnaire does not refer to the Application; thus, a question of fact exists as to whether the Renewal Questionnaire and/or the 2011 Policy incorporate the Application, including the questions regarding criminal, driving and loss history. Defs.' Resp. Pl.'s SOF ¶ 11 [DE 64].  In support of this argument, defendant cites the Renewal Questionnaire's warning that "[a]ny misrepresentation in this application for renewal of insurance will render insurance coverage null and void." *Id*.

Assuming, without deciding, that the Renewal Questionnaire did not incorporate the Application, defendants' argument overlooks *uberrimae fidei's* unforgiving obligation to disclose material facts even if "not directly inquired into by the insurer."  *Cassin I*, 48 V.I. at 725; *see Diller*, 678 F. Supp. 2d at 297 (describing the obligations under the doctrine as "inherently harsh").  This case is similar to *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 992 F. Supp. 278 (S.D.N.Y. 1998).  In *Allendale*, the insured agreed to disclose any survey report recommendations regarding its insured property pursuant to the terms of a six-month contract, which it failed to do.  *Id*. at 281.  Upon expiration of the contract, the parties entered into a new contract, which did not include a duty to disclose survey report recommendations.  *Id*.  Sometime thereafter, the insured's property was destroyed by fire.  *Id*.  The insurer rescinded the second

---

response to factual contentions raised for the first time in defendants' opposition.  Accordingly, the Court may rely on Great Lakes' 2010 Amendatory Clauses.  *See e.g., P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1356 (Fed. Cir. 2002) (finding trial court did not improperly rely on facts the government first submitted in its reply brief which rebutted defendant's factual assertions in its opposition to the government's motion for summary judgment); *Hammons v. Computer Programs & Sys., Inc. (CPSI)*, 2006 U.S. Dist. LEXIS 89952, at *53 (S.D. Ala. Dec. 12, 2006) ("[N]othing in the extant authorities, or in the Federal Rules of Civil Procedure, forbids a movant from making supplemental record submissions in a reply brief to rebut specific arguments raised by the non-movant's opposition brief.").

Moreover, even if the Court ignored Great Lakes' post-discovery evidence, the fact remains that the 2011 Policy specifically indicates the parties' acquiescence to the application of *uberrimae fidei* to the insurance contract. As explained below, this doctrine required Kranig's disclosure of all material facts notwithstanding Kranig's interpretation of the Amendatory Clauses.

contract in light of, *inter alia*, the insured's alleged failure to disclose the outstanding survey

report recommendations.  The insured sued, arguing it was under no such obligation under the

express terms of the second contract.

The *Allendale* court disagreed given the survey clause in the original contract placed the

insured "on notice" of its importance to the insurer.  *Id*.  The court explained its rationale as

follows:

> [t]he doctrine of uberrimae fidei [] would count for very little if a[n] []insurer not
> only had to inform its []insured that it considered desired information material,
> but had to renew this notice every six months. Such a result would effectively
> impose on []insurers a duty of inquiry, despite well-settled precedent to the
> contrary.
>
> Nor could uberrimae fidei retain significance if a[n] []insurer's notice of
> materiality was held to lapse every time a new contract is executed. Were that the
> case, "materiality" would often be limited to those matters required to be
> disclosed by specific terms of the contract. This result would clearly frustrate the
> information-forcing purpose of the doctrine.

*Id*. at 283 (internal citations omitted).

Similarly, at the time of signing the Renewal Questionnaire, Kranig was on notice of the

importance of Kranig's and Bonwit's criminal and driving records to Great Lakes based on the

Application.  *See id*. at 285 ("Materiality is determined with reference to what the []insurer

considers important, not the []insured."); *accord Deep Sea Fin., LLC v. QBE Ins., Ltd.*, 2013

U.S. Dist. LEXIS 46151, at *15 (S.D. Ga. Mar. 28, 2013) ("*Uberrimae fidei* does not allow the

insurance applicant to unilaterally determine what is material.").  Moreover, Kranig completed

the Application just one year prior to signing the Renewal Questionnaire.  As such, Kranig

"cannot seriously maintain" that "a sufficient passage of time" had occurred rendering this

information "stale" such that a reasonable insured could conclude that the insurer no longer

considered the information important to the issuance of a policy.  *Allendale*, 992 F. Supp. at 283.

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 20

In these circumstances, the Court finds Kranig's omissions were material as a matter of law.[16] And, while not dispositive, this conclusion is buttressed by Osprey's Beric Anthony Usher, who avers that had he known of Kranig's or Bonwit's "true driving and criminal histories, the insurance coverage sought in the Application and the Renewal [Questionnaire] would have been declined."  Usher Decl. ¶ 20 [DE 59-1].

Accordingly, there is no genuine issue of material fact that would preclude summary judgment in favor of Great Lakes.  The result of Kranig's material omissions is that the marine insurance policy at issue is void *ab initio*.  *See Deep Sea Fin., LLC*, 2013 U.S. Dist. LEXIS 46151, at *13-14 (holding under the doctrine of *uberrimae fidei*, marine insurance policy declared void *ab initio* for corporate insured's failure to disclose that one of its co-owners had filed suit against the other co-owner for "various types of fraud in a federal action filed prior to the insurance issued"); *C.N.R. Atkin v. Smith*, 137 F.3d 1169, 1171 (9th Cir. 1998) (holding insured's undisclosed criminal conviction for knowingly secreting a boat and possessing an unlawfully obtained certificate of title material as a matter of law); *Jackson v. Leads Diamond Corp.*, 767 F. Supp. 268, 270-71 (S.D. Fla. 1991) (holding under the doctrine of *uberrimae fidei*, jeweler's block policy declared void *ab initio* for failure to disclose employee's criminal conviction even though "there were no questions on the application concerning prior criminal records of any employee of the [d]efendant corporation"); *cf. La Reunion Francaise v. Christy*, 122 F. Supp. 2d 1325, 1331 (M.D. Fla. 1999) (holding insured's failure to disclose a twelve year old criminal conviction was not material as a matter of law under the doctrine of *uberrimae fidei*

---

[16]    *See e.g., Progressive Specialty Ins. Co. v. Rosing*, 891 F. Supp. 378, 380 (W.D. Ky. 1995) (finding no reasonable jury could find an insured's omission of a DUI conviction immaterial because "[n]othing could be more material to a driver's potential risk than evidence of a propensity to drink and drive" and inquiring whether "anyone [can] seriously dispute that each additional incident increases the likelihood that another similar one may occur in the future, thus materially impacting a policy risk").

because the insurance application specifically limited disclosure to "violations/suspensions (including auto) in last 5 years").[17]

## V.   SUMMARY JUDGMENT AGAINST NEBAT

Great Lakes also seeks summary judgment against NEBAT, arguing NEBAT, as loss payee under the 2011 Policy, has no rights superior to Kranig.  Pl.'s Mem. at 11 [DE 58].

Under New York law, "a loss payee is not protected independently of the insured, absent a clause to that effect in an insurance policy."  *Cassin II*, 544 F.3d at 265 ("In the absence of a provision that the insurance policy shall not be invalidated by any act or neglect of the insured, . . . a loss payee may only recover if the insured could have recovered.") (citing *Wometco Home Theatre, Inc. v. Lumbermens Mut. Cas. Co.*, 97 A.D.2d 715, 716, 468 N.Y.S.2d 625 (N.Y. App. Div. 1983)).  Here, there is no indication in the 2011 Policy that NEBAT is entitled to any rights superior to Kranig.  Indeed, defendants concede at the outset that NEBAT's "rights are derivative of Kranig's."  Defs.' Resp. at 1 n.1 [DE 63].  Because the Court finds summary judgment appropriate in favor of Great Lakes and against Kranig, summary judgment is also appropriate in Great Lakes' favor as against NEBAT.

---

[17]    Because Great Lakes is entitled to summary judgment on the basis of the application of the *uberrimae fidei* doctrine, the Court does not address in detail Great Lakes' alternative arguments in support of its motion for summary judgment.  However, the Court makes the following observations.  First, with respect to the survey warranty, genuine issues of material fact exist with respect to Kranig's compliance with its requirements.  Assuming, *arguendo*, that the warranty language is unambiguous, and Kranig's March 30, 2011 in-water survey satisfies part of the warranty, the record contains no evidence as to whether Kranig ever complied with the many recommendations in that survey.  *See* Ex. D, CYIA Amendatory Clauses [DE 59-4].  Second, with respect to the refund of the policy premium, a question of material fact exists as to whether Master-Risk's acceptance of the tender premium ratified Great Lakes' coverage declination on behalf of Kranig, especially in light of Kranig's failure to cash the return premium check from Master-Risk.  *See, e.g., Colonial Life Ins. Co. v. Mazur*, 25 N.J. Super. 254, 262-63, 96 A.2d 95, 100 (Ch. Div. 1953) ("Where, as here, the check [from the premium finance company] was neither cashed nor presented for payment, [the insured] cannot be held to have acquiesced" in the insurer's attempt to cancel the policy).

*Great Lakes Reinsurance (UK) PLC v. Kranig et al.*
Civil No. 2011-122
Page 22

## VI.     CONCLUSION

For the foregoing reasons, the Court will grant summary judgment in favor of Great Lakes and declare the 2011 Policy *void ab initio*.  The Court will also dismiss with prejudice defendants' counterclaim.  An appropriate order follows.


**Dated:** June 12, 2013                           S_____

**RUTH MILLER**
United States Magistrate Judge